<div align="right">RUGELY<br><i>v.</i><br>GOODLOE.</div>

## PICKERSGILL & CO. *v.* BROWN.

By the terms of a judicial sale, purchasers were, in substance, required to take the property subject to so much of the antichresis as might be due, and such of the recorded mortgages as, upon investigation, should turn out to be *bonâ fide*. *Held*: Under such description of the interest, its value was altogether undefined. It is the right of the debtor, under the law, that his property should be sold at a certain price. Here the price was uncertain—it was not sold for so much over the amount of mortgages stated in the certificates, but a bid for so much money, subject to such amounts as might be *bonâ fide* and really due under them. The sale was, therefore, defective.

In judicial sales, there must be a definite description of the thing sold. The law will not countenance their being made lotteries, at the bidding, and sources of confusion and strife afterwards.

Where a creditor causes a sale of an indefinite and uncertain interest in property; becomes the purchaser, under a title defective on its face; takes no possession of the thing purchased, and no ratification of the proceedings is shown to have been made by the defendant in execution—in an action by the purchaser, restraining a mortgagee from the enjoyment of his apparent rights in the property, and calling upon him to account, it is competent for the mortgagee to set up the defects in the judicial sale under which the purchaser claims.

Subsequent mortgagees have the right to dispute any prior mortgage, and to inquire into its validity and amount. They have also the right to ascertain, by action, whether apparent contracts, made between their debtors and other persons, are real, or mere fraudulent simulations. They have also a right, subject to the limitation which the law has prescribed, to an action for the avoidance of contracts, which, although they are real and sincere, were made in fraud of their rights as creditors.

Mortgages, under the hypothecary system of Louisiana, may be given to secure debts having no legal existence at the date of the mortgage. It is not essential, in such a mortgage, even with respect to third persons, that it should express on its face, that it was executed to secure future debts. It may be described as a security for existing debts, and yet used to protect those which, in the contemplation of the parties, were to be created at a future time.

A creditor, under an act of antichresis, is bound to make useful and necessary repairs of the pledged estate. But he will not be permitted to make improvements of a new, unusual and expensive character. If he do, he cannot insist on being reimbursed the amount which these improvements may have cost, but only their actual value to the estate. The consent of the debtor to improvements of the latter description, estops him from complaint.

If a debtor, who is secured by antichresis, agree with his creditor to appropriate the revenues in a manner different from that prescribed in the act, by which the antichresis was created, a mortgage creditor, who has not put his mortgage in action, cannot complain.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *Grymes* and *Roselius*, for plaintiffs. *Benjamin* and *Micou*, and *Levi Pierce*, for defendant. By the court:

SLIDELL, J. The plaintiffs represent in their petition, that they hold three judgments against *P. M. Lapice*, amounting in principal and interest, to upwards of $100,000, rendered in the years 1844 and 1846, and recorded in the year 1844, and subsequently, in the parishes of St. James and Concordia; that, on the 28th April, 1842, *Lapice* executed a mortgage in favor of *James Brown*, for an amount of $250,000, and on the 12th May, of that year, another mortgage in his favor for the amount of $150,000; that, on the 3d of May, 1842, *Brown* obtained a judgment, in the first judicial district, for $250,000, upon *Lapice's* obligations for that amount, being the same recited in the mortgage of that date; that the mortgages and judgment covered all the lands and slaves owned by *Lapice*; that, on the 30th May, 1843, *Lapice* executed, in favor of *Brown*, an act of pledge, by way of antichresis, of the same lands, to secure the above amount of $400,000, in which *Brown* acknowledged possession, and covenanted to appropriate the fruits and monies to the payment of his claims and interest.

The petition further represents, that *W. C. Pickersgill* had purchased, in 1850, under an execution issued upon one of the judgments in his favor, "the equity of redemption" of *Lapice* in and to all the plantations and slaves, and that, as such purchaser, he stands in relation to that property in the place of *Lapice*.

The petition further alleges, that *James Brown* has caused executions to issue upon the judgment for $250,000, and has levied upon the plantations and slaves, and is about to cause them to be sold, under pretence of satisfying the judgment. It charges, that the proposed sale is intended to cut off "the right of redemption," and under cover of the imposing amount of debt apparently due, to preclude competitions and prostrate the creditors of *Lapice*; that these acts of *Brown* are intended for the sole benefit of *Lapice*, and to enable him to elude his creditors; that he has an understanding with *Brown*, and that the executions will result to *Lapice's* benefit.

The petitioners further charge, that the plantations have, since the date of the antichresis, produced a large amount of fruits and revenues, so as to have wholly or in great part, paid the debt to *Brown*.

They further charge, that the debt, although ostensibly originating in a loan of $400,000, was not for an actual advance of that sum in cash, but in stocks, bonds, or other papers, at their nominal or par value, which was greatly above their market value; and that other devices were used, of a usurious character,

to increase the amount of said loan beyond its true value in money; that the granting of the mortgages, the confession of judgment, and the antichresis, were intended as means by which *Lapice* might frustrate his creditors; that the judgment is null, because, when it was rendered, there was no debt due by *Lapice;* and, when it was confessed, it was clearly understood between the parties, that it was not to be enforced or excuted as a judgment, but was only to stand as security for the debt, if any existed; and certain terms of credit were to be allowed *Lapice*, as appears from the subsequent act of antichresis, into which the mortgages and judgment were merged, by which they were controlled.

The petitioners further charge, that *Lapice* still remained in the possession of the property, notwithstanding the antichresis, and has been permitted to expend a large portion of the revenues arising therefrom, in vast and extravagant improvements and embellishments, beyond what was necessary for the preservation and cultivation of the estates, for the sole benefit of *Lapice*, and to the injury of his creditors; that "the right of redemption" cannot be exercised against the mortgages, judgment, and pledge held by *Brown*, without an exact account and knowledge of the amount due to him.

The prayer of the petition is, that *Brown* be decreed: 1st. To file a just and true account of all the monies and things advanced by him, showing in what, whether money or other things, the loan consisted. 2. To file an accurate and true account of the gross amount of fruits and revenues of the plantations and slaves, showing the disposition made of them ; how much for necessary purposes; how much for other improvements, and how much had been applied to the extinguishment of the loan, principal or interest. 3. An accurate and true copy of the account kept by him, between himself and *Lapice*, since his first advance of money; to the end that the plaintiff might be informed of the true amount of indebtedness of *Lapice*, and might be enabled to say what real and subsisting lien or mortgage *Brown* has upon *Lapice's* property, and that the debt may be reduced to its proper and just amount, and the plaintiffs allowed to pay off the same.

The petition concludes with a prayer for general relief and an injunction, and also that *Brown* answer, under oath, certain interrogatories annexed to the petition.

In his answer, the defendant asserts the justice of the debt, and his right to execute the judgment; produces his accounts with *Lapice ;* denies all the alle gations of the petition, tending to invalidate his rights under the act of mortgage, the judgment, and the antichresis. He also pleads prescription, and prays a dissolution of the injunction with damages, &c. He filed his sworn answers to the interrogatories.

The nature of the interrogatories and answers will be best understood by stating them at length. They are as follows :

1. Did you make a loan of four hundred thousand dollars to *Peter M. Lapice*, at any time between the 28th, day of April,⸗1842, and the 13th day of May, 1843. If you did, then state and set forth the date at which such loan was actually made ?

If the loan was not made all at one time, then set forth the date at which each separate sum was advanced or paid ?

2. Was the whole sum of four hundred thousand dollars advanced or paid over to the said *Lapice* in person, or was it disbursed, and paid out by you, or any agent of yours, in the payment or extinguishment of debts due by said

*Lapice* to others, or incumbrances, or liens, upon his property? If it, or any part of it, was paid out and disbursed by you or any agent, or agents of yours, then state who so paid the same, and to whom was it paid; in payment of what debt, or in extinguishment of what lien or incumbrance, and how much to each individual.

3. Was the loan so made to the said *Lapice,* or the monies so advanced to him, or paid to his creditors, made or paid in cash, coin, or circulating bank notes; or was any portion of it so advanced to said *Lapice,* or paid for him to others, advanced or paid in any species of paper other than current bank notes, redeemable on demand in specie? Was any portion of it advanced or paid in any description of stocks or bonds of any State, or bank, or of any individuals, or any other description of paper or credits; in fact, in any thing but gold or silver coin, or current circulating bank notes, convertible into coin on demand? If yea, then set forth particularly what part or portion of said advance, or the payments so made, were in such stocks, bonds, or paper, credited. To whom were such stocks, bonds, or paper credits paid, in payment of what debt, or extinguishment of what lien or incumbrance? Were they advanced or delivered to the said *Lapice,* or paid away to others at their par or nominal value, or at a discount? If at a discount, then at what rate? What was the cash value of any such paper in the markets of New York or other cities of the United States or elsewhere, at the time they were so advanced or paid out? Were they not at a discount? If yea, what was the rate of discount? Set forth your whole knowledge in relation to the matters embraced in this interrogatory, as fully as if herein specially and more particularly interrogated.

4. What has been the gross yearly revenue of fruits arising, year by year, from the four plantations and slaves, and all the other property pledged to you by way of antichresis, by the deed of antichresis, executed to you by the said *Lapice* on the 13th of May, 1843, from the date of the said act up to the time of answering this interrogatory? Annex to your answer a true and accurate account thereof, and say, on your oath, if the same be a true and accurate account.

5. If, in answer to the last interrogatory, you furnish any account, or state any amount, then state whether the account or sum so stated comprises all the crops, fruits, or revenues actually grown or gathered from the said property, or only such as have come to your hands, or those of your agent or agents? And if anything more was actually grown upon or gathered from said property; then state into whose hands the same passed, for what purpose, and how it was disposed of? and, particularly, set forth whether any part or portion thereof was retained, held, or came to the hands of the said *P. M. Lapice,* and if any was retained, or came to the hands of said *Lapice,* then say how much? Of what it consisted, and what was its value.

6. What is now the state of the account between you and the said *Lapice?* Annex the account to your answer, and say whether it is a true and just account, embracing all and every description of transactions between you and the said *Lapice,* directly or indirectly?

7. How have the fruits, revenues, and crops of all the said property, since the 13th day of May, 1843, been applied? State, particularly, how much thereof has been applied to the ordinary expenses of all the said plantations; what extraordinary improvements, additions, and erections in mills, houses, and steam apparatus, or of what nature or kind has been made, and what portion of said crops, fruits, and revenues have been applied to that purpose, and what portion thereof has been applied to the credit of your debt; annex to your answer a just

and true account, showing, distinctly, what has been expended under each of the <span style="font-variant: small-caps">Pickersgill</span> above heads.

8. Has not the said *Peter M. Lapice*, ever since the said 13th day of May, 1843, resided, alternately, upon some one or all of the said plantations mentioned in the deed of artichresis of that date ? Has he not had the sole or chief management, direction, cultivation, and superintendence thereof? Has he not been permitted, since that period, to expend large sums of money thereon in the erection of new buildings, new sugar works, new steam apparatus for the manufacture of sugar, and many other things of the like nature ? What was the cost of each and every such improvement, building, or other apparatus, and what was the aggregate amount of the whole? Does it not greatly exceed the usual and ordinary expenses for maintaining and cultivating such plantations ? Does not the expenditure, for this purpose, amount to or exceed one hundred thousand dollars ? And was not the whole of that expenditure made from the crops, fruits, and revenues accruing during the period aforesaid ? Set forth the same in detail, and as particularly as if herein more specially interrogated.

9. You being in the actual possession of all the said lands, plantations and slaves, and in the free and uninterrupted enjoyment of all the rents, issues, and profits arising therefrom, until the full and entire reimbursement of your loan to said *Lapice*, in principal and interest, by virtue of the deed of antichresis aforesaid, what was your motive, object, or intention, or that of your agent, in issuing an execution on the judgment conferred to you by the said *P. M. Lapice*, on the 3d day of May, 1842, for two hundred and fifty thousand dollars, a part and parcel of said loan ? Set forth, specially, what was your object, motive, and intention? Was it not to favor the said *Lapice* ? Was it not to aid and assist him to hinder and obstruct his other creditors, and these petitioners in particular, and to prevent their pursuing or meddling with the said property, or to render the equity of redemption of the said *Lapice*, which they, or any of them, had, or might acquire, of no value ? Was not this step taken with a view to the ultimate benefit of the said *Lapice?* Had you, or your agent, any agreement with the said *Lapice*, or any understanding with him, express or tacit, on the subject? If yea, then set forth the same fully, according to your whole knowledge and information ? Have you had any correspondence with your agents in New Orleans, or with the said *P. M. Lapice*, on the matter ? If yea, annex to your answers copies of all letters you may have received from either, and all you have written, or caused to be written, and say whether they are true copies, and all you have so received or written?

10. When you or your agent caused the said execution to issue, and the lands, plantations, and slaves aforesaid to be levied upon and advertised for sale under the same, was it your *bona fide* intention to take advantage of your position and the large amount of your debt, to cut off the equity of redemption of the said *Lapice*, or of any creditor who might become subrogated to his rights to vest the legal title to said lands, plantations, and slaves, in yourself, for your own exclusive benefit, and without any regard to the future rights, benefit or interests of said *Lapice*, or any one claiming under him? Set forth fully and at large, what was your object, intention, or purpose ?

11. Did you intend, at any sale made under the said execution, to permit the said property to pass into the hands of any third person, for a less sum than the full amount of your debt and interest due at the time of such sale ?

PICKERSGILL
*v.*
BROWN.

To the First Interrogatory : I answer, that I did make a loan to *Peter M. Lapice,* exceeding four hundred thousand dollars, principal and interest, through my firm *Brown, Brothers & Co.,* of the city of New York. In this loan there was included a balance of an account due by *P. M. Lapice.* The remainder thereof was made in various sums and at different times, between the 28th day of April, 1842, and the 13th day of May, 1843, partly in cash, and partly in bonds, which were taken as cash at the market value thereof, or at the value which the same were actually worth to the said *Lapice.*

The accounts hereto annexed, marked A, 1, 2 and 3, and which I believe to be correct, show the particular dates when such loans were made, and what portion thereof was made in bonds, and what portion in cash, (the drafts therein mentioned having been paid in cash,) and I refer to the same as containing a more full answer to this interrogatory.

To Second Interrogatory : I answer, that the whole sum of four hundred thousand dollars was not advanced or paid over to the said *Lapice* in person. It was, however, all paid and delivered to him either in person or upon his order, and for his use and benefit.

To the Third Interrogatory : I answer, that the aforesaid loan was made partly in cash, and partly in bonds, which were taken as cash at the market value thereof, or at the value which the same were actually worth at the time, to the said *Lapice.* Such price or value will appear by reference to the aforesaid accounts marked A, 1, 2 and 3. The drafts mentioned in the said accounts were all paid either in gold or silver coin, or in circulating bank notes, redeemable on demand.

To the Forrth Interrogatory : I answer, that the credit side of the several accounts hereto annexed marked B, 1, 2 and 3 ; C, 1, 2 and 3 ; D, 1, 2 and 3 ; E, 1, 2 and 3 ; F, 1, 2 and 3 ; G, 1, 2 and 3 ; and H, 1, 2 and 3, (which form part of my answer to this and the other interrogatories,) show, to the best of my knowledge and belief, the gross yearly revenue or fruits arising, year by year, from the plantations and slaves in this interrogatory mentioned and referred to, from the date of the deed of antichresis down to the first of November, 1850. I am unable to state the gross revenue or fruits thereof, if any, for the present year, for the reason, that the books containing the accounts thereof are kept by my agent, *Samuel Nicholson,* in New Orleans, and I have not at present any means of access thereto, nor have I copies or other extracts therefrom.

To the Fifth Interrogatory : I answer, that the accounts hereto annexed comprise, to the best of my knowledge and belief, all the crops, fruits, or revenues actually grown or gathered from the said property, down to the said first of November, 1850 ; that if any other crops, fruits or revenues were grown or gathered from the said property, the same have not been received by me or my agent to my knowledge or belief. I do not know that any portion of such proceeds came or went into the hands of *P. M. Lapice.* I think no part thereof ever came or went into his hands, but that all of the same was received by my said agent.

To the Sixth Interrogatory : I answer, that I am unable to answer this interrogatory, otherwise than, at the last annual account, on the 1st day of November, 1850, there remained a balance due to me from the said *Lapice,* upon the aforesaid loan, after making all just credits, of $742,626 01, as will appear by reference to the account, which is hereto annexed and marked H, No. 3. To the best of my knowledge and belief, the accounts hereto annexed, are just and

true accounts of all the transactions between the said *Lapice* and myself, down to the date last aforesaid.

To the Seventh Interrogatory : I answer, that the net proceeds of the fruits, revenues and crops, of all the property pledged, since the 13th May, 1843, after deducting the payment of the expenses and disbursements thereon, and on account thereof, (which are herein, and in the accounts thereto annexed, mentioned and referred to,) have been justly, truly and properly applied in, and towards, the payment and satisfaction of the aforesaid loan. I cannot state further or more particularly, than I have stated in and by these my answers, and in and by the several accounts hereto annexed, what portion of the said crops, fruits and revenues has been applied to the ordinary or extraordinary expenses of the plantations. Nor can I state further, than I have elsewhere in these answers stated, what improvements, additions, and erections of mills, houses and steam apparatus, have been made since the period last stated; but whatever may have been made, I believe to have been necessary or otherwise proper, as I have hereinafter more particularly stated.

To the Eighth Interrogatory : I answer, that *Peter M. Lapice*, has generally resided since the 13th May, 1843, on the St. James sugar plantation; but he has not had the sole or chief management, direction, cultivation and superintendence thereof. The management and control of the sugar plantation, were had by my agent, *J. Delamar*, and the cotton plantation by my agent, *J. M. Lapice.* It is true, that the long experience and capacity of *Peter M. Lapice*, were such as to induce me, through my agent, to consult him on important matters connected with the management of said sugar plantation, its cultivation and the manufacture of sugar; and it is true, that great weight was attached to his counsel and advice on these subjects, the more especially, as he was to receive back the plantations after the payment of my claim, and consequently, was greatly interested in making them productive. But said *Lapice* did not reside on any one of the cotton plantations, nor had he the least control or management of them. It is true, that large sums of money have been expended in the erection of a new sugar house, and in the furnishing of a new apparatus for making sugar on said plantation, and the cost was certainly greater than the " usual and ordinary expenses for maintaining and cultivating said plantation," but it was not greater than, in my judgment and opinion, was necessary for making the plantation as productive as I could. These improvements were exclusively projected and devoted to augmenting the revenues of said sugar plantation, and not to embellishments of any kind. They were the same in nature and intent, as those made at the same period by several other large planters in this State, and which have since been generally adopted on sugar plantations; and without them, the revenue and produce of said plantation, would have fallen far short of what they actually were. I cannot state the precise sums expended for each and every improvement, building or apparatus, further or otherwise, than is contained in the several accounts relating thereto, which are hereto annexed; from which said cost, as well as the total expenditures, can, as I suppose and believe, be readily ascertained. On the cotton plantations, no expenditures were incurred for improvements, buildings or apparatus, beyond the usual and ordinary expenditures for maintaining and cultivating said plantations.

To the Ninth Interrogatory : I answer, that my motive, object and intention in issuing the execution referred to in this interrogatory, was not to favor said *Lapice*, but to make the amount of my debt. My motive and object, were not

PICKERSGILL
v.
BROWN.

to aid and assist him, to hinder and obstruct his other creditors or the petitioners, nor had I any reference to the interests of the other creditors, but I regarded my own only. I had no agreement or understanding with *Peter M. Lapice* on the subject, nor any correspondence on the matter. In further explanation of my motives, I will say, that I had become satisfied that the property pledged to me, was not more than sufficient, even if sufficient, to pay my claim. That the extreme desire always expressed by *Peter M. Lapice* to pay his creditors, had induced me, year after year, to continue without enforcing payment, so as to leave him the chance of paying me with the revenues, and thereby becoming able to satisfy all his other creditors. That his strong hope of success in the project, induced me to lend every indulgence in my power, and that when the petitioners sold out his equity of redemption, and became themselves the owners, there no longer existed in my mind the same motive for indulgence, and I determined to bring the business at once to a close.

To the Tenth Interrogatory : I answer, that my intention, prior to the seizure and sale of *Lapice's* equity of redemption, was to indulge him as long as I possibly could in the effort to pay me by the revenues of the plantations, and thus acquire the means of paying his other creditors; also, that this motive no longer existed when the petitioners became the owners of the equity of redemption, and that then my intention in taking out the execution, was to make my claim good in the best way I could, for my own exclusive benefit, and without any regard to the future rights, benefit or interest of said *Lapice*, or any one claiming under him.

To the Eleventh Interrogatory : I answer, that I had not made up my mind how far I would go, in bidding on the plantations at the sale. I should have exercised my discretion on the day of sale, through my agent; and I therefore neither intended to permit nor to prevent the property to pass into the hands of any third person, for a less sum than the amount of my debt and interest due at the time of said sale ; I had formed no intention whatever on the subject.

It will be observed, that the petitioners claim in the double character of purchasers of the so called equity of redemption, and as judgment creditors.

We will first consider the rights acquired under that purchase ; the disposition of that subject will tend to simplify the subsequent investigations.

The deed under which *W. C. Pickersgill*, one of the plaintiffs, claims, is a deed executed by the Marshal of the United States, for the Eastern District of Louisiana, acting under a writ of *fieri facias*, issued upon a judgment in the suit of *W. C. Pickersgill* v. *P. M. Lapice*. It recites, that under the writ he had seized " the equity of redemption and all the rights, titles or interests in reversion or otherwise, which the said *P. M. Lapice* has, or may have, in and to the following property," describing the plantations and slaves in the parishes of St. James and Concordia, as described in the antichresis, the rights aforesaid, " being his equity of redemption in the lands, plantations and slaves, as described and pledged to the said *James Brown*, by said act of antichresis; and all his right, title and interest in all and every of the said lands, plantations and slaves, in reversion or otherwise, after the payment of the sum of $400,000 to the said *James Brown*, as stipulated in the said act of antichresis, or such part thereof as may be due at the time of the sale, and after the extinguishment of all *bonâ fide* mortgages, that may actually be due and recorded in said parishes of Concordia and St. James, previous to the judicial mortgage of the plaintiff, arising from the record of this judgment in said parishes;" and, after due notices and advertisements, exposed the property for sale at the St. Louis Exchange, in New

Orleans, on the 30th March, 1850, when the said equity of redemption and other   PICKERSGILL
rights, &c., were adjudicated to *W. C. Pickersgill*, the plaintiff, for the price of      *v.*
three thousand five hundred dollars. The certificates of mortgage in the two   BROWN.
parishes are declared to have been read at the sale, and annexed to the return of
the writ.

Various grounds of invalidity have been presented by the defendant against
this title; but we deem it unnecessary to notice any other than those which
relate to the indefinite information given at the sale, as to the extent of the
debtor's interest, and to the uncertainty of the price. The mortgage certificate
exhibited incumbrances to an amount exceeding one million of dollars. Purchasers
then, as has been correctly argued, were, in substance, required, by the terms of
sale, to take the property, subject to so much of the antichresis as might be due, and
such of the recorded mortgages as, upon investigation, shall turn out to be *bonâ
fide*. Under such a description of the interest, its value was altogether undefined;
and it will be observed, that the language was calculated to raise doubts and con-
jectures in the minds of bidders, without supplying any means, at the time of
the bidding, by which such doubts could be solved, or such conjectures confined
within any reasonable limits. It was an inuendo that the whole debt named in
the antichresis was not due, and that some of the mortgages were unreal. The
tendency of such a suggestion would obviously be, to mystify the uninformed,
check that fair competition which, in the interest of the debtor, the law contem-
plates, and enable one, or a few, to speculate upon their private information, to
the exclusion of others, and the sacrifice of the defendant in execution.

Again, it is the right of the debtor, under the law, that his property should be
sold at a certain price. Here the price was uncertain. It was not for so much
over the amounts of mortgages stated in the certificate, but a bid for so much
money, subject to such amounts as might be *bonâ ·fide* and really due under
them. If the bid had been for a sum over and above the amount of the recorded
mortgages, then the amounts of those mortgages, added to the amount of the bid,
would have formed the total price to be paid by the purchaser, for the thing
sold. The amount of the mortgages would be considered, by the law, as so
much of the price retained in the purchaser's hands to meet them; and in case
it turned out afterwards that any of the mortgages had been paid, or were
unlawful simulations, the purchaser would owe their amount to the judgment
debtor. See C. P. 683. *Trudeau v. McVickars*, 1 Ann. 427. *Rowley* v.
*Rowley*, 19 L. R. 576.

The decisions on the subject of invalidities in judicial sales, are numerous; and
the cuurent of authority is uniform in support of the general doctrine, that the
law will not contenance their being made lotteries at the bidding, and sources of
confusion and strife afterwards. See *McDonogh v. Gravier*, 9 L. R. 542
*McGary* v. *Dunn*, 1 Ann. 338. *Gates v. Christy*, 4 Ann. 294.

It is true that the present defendant, who invokes the nullity of the judicial
sale, does so collaterally, and is not the defendant in execution. But we are of
opinion that he has a right to do so under the circumstances of the present case,
his apparent rights being attacked, and he called upon to account to one holding
a title which is defective on its face, and unaccompanied by possession. For it
will be observed, that the ownership of the lands and slaves was in *Lapice*, (as
we shall presently notice more particularly,) no seizure of them was made by
the marshal, nor was there any tradition but of the naked instrument of convey-
ance, nor is any ratification or acquiescence by *Lapice* shown. How far others

PICKERSGILL
*v.*
BROWN.

than the defendant in execution, or his assigns, can set up the nullity or irregularities of a judicial sale, against a purchaser whose purchase is aided by possession, is a question not involved in this cause.

We shall, therefore, lay out of view the judicial purchase of the so called equity of redemption, and consider the plaintiffs merely in the character of judgment creditors, having judicial mortgages upon the lands and slaves of *Lapice*.

In that character, they have the right to dispute any prior mortgage, and inquire into its validity and amount. They have, also, a right to ascertain, by action, whether apparent contracts made between their debtors and other persons are real, or mere fraudulent simulations. They have, also, a right, subject to such limitations as the law has prescribed, and an action for the avoidance of contracts which, though they are real and sincere, were made in fraud of their rights as creditors. Of the latter class of actions, we will have occasion to speak more particularly hereafter.

Before we proceed to consider the various legal grounds upon which the apparent rights of the defendant, as a mortgage creditor of *Lapice*, are disputed, it is necessary here to notice certain matters of fact, which are material, in that investigation.

The mortgage of the 28th April, 1842, on its face, purports to be made to secure a loan of $250,000, made to *Lapice* by *Brown* on that day, and for which he gave his obligation to the order of *Brown*, payable on demand, and bearing interest at the rate of eight per cent per annum from date until final payment. Upon this obligation a judgment was confessed on the 3d of May, 1842. The mortgage of the 12th May, 1842, recites the former loan, and on its face purports to be made to secure "a further loan of $150,000, being the amount of sundry promissory notes drawn by him, the said *Lapice*, paid by the said *Brown*, and other advances made by him for the accommodation of *Lapice*, which sum he hereby acknowledges to have received from the said *Brown*, in the manner aforesaid, and hereby binds himself to pay and reimburse at any time hereafter, and whenever the same shall be demanded, with interest thereon, at the rate of eight per cent per annum from the day of the date hereof until final payment; and to that effect, the said appearer has furnished a certain bond or obligation, by himself subscribed, dated this day, made to the order of the said *James Brown*, for the said sum of $150,000, payable on demand, bearing interest at the rate of eight per cent per annum, from date, until final payment," &c. The act also contained a covenant by *Lapice*, to ship his crops to defendant's house "so long as *Lapice* shall continue to be indebted to said *Brown*, and stipulated in his favor a lien upon them." But, while such was the language of these instruments, it clearly results from the evidence, that in point of fact these bonds, mortgages and assignments, were intended by the parties to be, and were, taken and held by *Brown*, as securities for what was already due by *Lapice* in account current, and for what should thereafter become due in like manner, by reason of contemplated advances. Such would have been decreed to be the true state of the case, if at any time, for example, say on the 13th May, 1842, *Brown* had sued *Lapice* upon the two bonds nakedly, and *Lapice* had set up in defence the true nature of the transactions.

Now the plaintiffs insist, that from an analysis of the accounts produced, under oath, by the defendant, the amount due him on the 12th May, 1842, was not $400,000, but was at most only $228,971 38. On the other hand, the defendant admits, that these accounts do not show an indebtedness of $400,000 on the 12th May, 1842; but, he says they show further advances from the 12th

May to the 9th June, 1842, of upwards of $200,000; that the account A. 2, shows a cash balance on the 30th November, 1842, of $401,865 44, and the account A. 3, a cash balance on the 30th November, 1843, of $453,072 91, &c.

Such being the circumstances of the case, the legal propositions, presented by the parties, stand thus : Your mortgages, say the plaintiffs, purport to be for loans and advances already made. They must be confined, therefore, to these existing loans and advances. Your advances posterior to 12th May, 1842, are unprotected by mortgage. On the other hand, the defendant argues, that as the mortgages and judgment were, in fact, taken not only as securities for existing advances, but such advances as might thereafter be made, so that the defendant should be covered in account current up to the amount and interest therein expressed, his right to avail himself of them, as such securities, is not impaired by the language in which the securities were expressed, and extends as well to the subsequent as to the antecedent advances.

These propositions involve two question of law : can a mortgage, under our hypothecary system, be given to secure debts having no legal existence at the date of the mortgage ? If so, is it essential, as regards third persons, that the applicability of the mortgages to future debts, should be expressed on its face, or may it be created, in the form of a security, for an obligation described as actually existing ?

Upon both these points, our opinion is clearly with the defendant.

The general definition of mortgage, contained in the 3257th article of our Civil Code, supposes the existence of a principal obligation, of which the mortgage is an accessory, and such is the general theory implied in article 3251. But inasmuch as such a theory, strictly construed, would be inadequate to all the practical purposes of business and the necessities of commerce, the lawgiver, in article 3259, has allowed the conventional mortgage a wider range, by declaring, that it " may be given for an obligation which has not yet risen into existence ; as when a man grants a mortgage, by way of security, for endorsements which another promises to make for him."

The argument of one of the counsel for the plaintiffs, was based upon a construction of this article, which gave perhaps too much weight to the illustration, at the expense of the broad language of the rule.

That argument, as we understand it, turned upon the theory, that unless there was a binding promise to make the loan at a future day, the mortgage must be considered null ; that the mortgage would, in such case, depend upon a potestative condition, for the mortgagee might afterwards refuse to lend, or the mortgagor to borrow ; so that there was no contemporaneous principal obligation, upon which the mortgage could attach. This theory is not a new one, and involves difficulties, which the framers of the code, perhaps, intended to put at rest, when they introduced the article 3259 into the amendments of the Code of 1808. The doubts, the refinements, and the controversies in which learned minds have been involved, on this subject of potestative conditions, considered in relation to mortgages, may be seen by consulting the French and other commentaries. See Merlin, Questions de Droit, Hypothéque, § 3. Troplong, Hypothéque, No. 474, *et seq.* and the authorities there cited.

But whatever be the soundness of the argument in the abstract, it must be observed here, that it assumes a state of facts inconsistent with the contemporaneous understanding of the parties, as fairly deducible from the whole aspect of the case presented by the record. Their acts create a reasonable presump-

tion, that their understanding was, that *Brown* should advance, and *Lapice* borrow, to an amount of $400,000, to be thrown into account current to be kept by *Brown*, who, through his agent in New Orleans, was to have the consignment of *Lapice's* crops, and act as his factor. At first, the parties seem to have supposed $250,000 would be a sufficient margin, but they subsequently enlarged it to $400,000, as shown by the second mortgage of May 12th; sometime previous to which, they had begun arrangements with regard to a settlement of *Lapice's* debt to the Merchants' Bank, which alone amounted to more than $100,000. And, although *Lapice* had not received an actual advance to the whole amount of $400,000 on that day, there is·no reasonable doubt upon our minds, that it was well understood he should have it, and that *Brown* could not, without a breach of good faith, have refused it. This reasonable inference, from the acts of the parties down to the 12th May, is fully supported by the events which followed within a reasonable time, and before the mortgages held by the plaintiffs came into being.

With regard to the question of the availability of these securities, to protect the advances made by *Brown* before the date of the first judicial mortgage obtained by the plaintiffs, there is, in our opinion, no room for controversy. The further question, whether these securities protect the account current in its subsequent movement, is not so free from difficulty; but after carefully considering this question, with reference to the broad language of our code, the commercial facilities which it may be fairly considered as contemplating; the decisions of the French Courts upon a state of legislation, not more favorable to the pretensions of the defendant than our own; the form in which the mortgage obligations were taken; and the fact, that advances, up to their amount, were actually made before the plaintiffs acquired their judicial mortgage; we are of opinion, that the account current and its eventual balance, is protected by these securities up to the amount, with interest, which those securities represent. See the discussion of this subject in Molinier's Treatise on Commercial Law, No. 226, p. 203 to 209, and the reasons given in the cases of Felemey c. Bonifay, Sirey et Villeneuve, 1841, 2, p. 521, Ib. p. 540, also Syndics Perrichon, c. Costaz et comp. Dalloz, 1848, 1, p. 234. Hildebrand c. Courcelles, Sirey et Villeneuve, 1848, 2, p. 728.

If, therefore, these mortgages had been made in express terms to secure such balance of account as was then due, and such advances as might thereafter be made in account current, up to a fixed amount, it seems to us clear, that the defendant would be protected by them. But the plaintiffs insist upon the strict words of those contracts; denounce them as false and fraudulent simulations, in declaring that they are given for loans already made; and contend, that as such, the mortgages are inoperative against them.

That any fraud was intended by taking the mortgages in this form, is unsupported by the evidence, and cannot be justly inferred from the surrounding circumstances. We consider the case, upon this point, as presenting a naked question of law, upon which the authorities are clearly in favor of the defendant.

In *Brander* v. *Bowman* and *Abercrombie*, 16 L. R. 371, the true consideration was not stated in the act of mortgage. In it *Bowman* acknowledged himself indebted to *Abercrombie* in the sum of $10,135, for which he executed his promissory note, and mortgaged a plantation. The plaintiffs, creditors of *Bowman*, brought an action to annul the mortgage, and subject the property to a judgment

they had subsequently obtained against *Bowman.* They charged fraud and simulation. The district judge gave judgment in favor of *Abercrombie* for $1983 53, as being the only amount which *Bowman* owed him at the time the mortgage was executed, and rejected the balance. *Abercrombie* appealed, and obtained judgment for the whole amount, as a mortgage creditor. The opinion is thus given by the court after stating the facts.

" In the present case, the plaintiffs resorted to interrogatories, for the purpose of establishing, from the answers of both defendants, not only the facts of fraud and simulation alleged in the petition, but also the undue preference stated to have been given by *Bowman* to *Abercrombie,* with a knowledge, on the part of the latter, of *Bowman's* state of insolvency ; but we think he has failed in his attempt. From the answer of both defendants, it results, that the act of mortgage attacked was executed for a valuable consideration, in this: That a part of the amount was really due at the time, and the balance was to secure certain endorsements or security debts which *Abercrombie* had contracted for *Bowman,* and which he was bound to pay one and two years afterwards ; the transaction is fully explained in *Abercrombie's* answer to the first interrogatory, and no evidence has been adduced to contradict it. It is true, that the evidence found in the record, shows that *Bowman* owed a great many debts at the time he executed the mortgage, and was perhaps in insolvent circumstances ; but, far from there being any proof to bring home a knowledge of the facts to *Abercrombie,* his answers to interrogatories show, that *Bowman* concealed the state of his affairs from him ; and again no evidence has been adduced to the contrary.

In this state of the case, the district judge thought that *Abercrombie* was entitled to recover the amount actually due him, by *Bowman,* at the time of the execution of the mortgage, and allowed him a preference over the plaintiffs for said amount, to be satisfied out of the property mortgaged. But, we think, he erred in not allowing him the benefit of the whole. It is perfectly clear, that " a mortgage may be given for an obligation which has not yet risen into existence, as when a man grants a mortgage by way of security, for endorsements which another promises to make for him." Louisiana Code, art. 3259. 8 Mart., N. S. 529. Here the endorsements had actually been made ; and, as we are bound to believe, from the answers of *Abercrombie* to the interrogatories propounded to him by plaintiffs, which answers stand uncontradicted, that the contract of mortgage complained of was in good faith, we see no reason why the effect of said mortgage should not be extended to the whole of the debt."

Thus, we see it was held, in that case, that the mortgage was valid, although the consideration recited was not the real one, there being another lawful consideration proved.

There is a case reported in *Dalloz,* which, while it is pertinent to other questions involved in this cause, is very satisfactory on the particular point we are now considering. The facts were, that in 1839 *Perrichon,* in a notarial act, acknowledged himself to be indebted to the house of *Costaz & Co.* in the sum of forty thousand francs, being, as expressed in the act, for a loan of that amount previously made to him by that firm, which he promised to pay at fixed dates. He mortgaged real estate to secure this debt. In 1841, he became insolvent. *Costaz & Co.* claimed a mortgage rank for 40,000 francs, in virtue of this instrument and its registry. The syndic of the insolvent opposed the claim, on the ground that the mortgage was only available for the indebtedness existing at its execution ; that by the account current between the parties, it appeared that

payment had been made, the amount of which should be imputed to the hypothecary obligation, which was thus extinguished. They also contend, that the inscription was null, for want of an exact indication of the true nature of the debt, and the period at which it was exigible. *Costaz & Co.*, on the other hand, contended that the mortgage under which they claimed, had been, in truth, given to serve as a security, not only of such amounts as were due to the house at its date, but for the eventual balance in account current, so that neither the obligation nor the mortgage were extinguished by the mere fluctuation of the account current; and that, as to the inscription, the information it contained relative to the date, nature, and exigibility of the debt, was sufficient, notwithstanding the variance from the true nature of the agreement between the parties, to enlighten third persons as to the incumbrances on the debtor's property, and protect them from being deceived.

The tribunal of Bourgoin declared the mortgage ineffectual, upon the ground, among others, of the variance of the ostensible contract from the real agreement of the parties. But this decree was reversed by the court of Grenoble; and, on further appeal, the latter judgment was sustained by the court of last resort. In its opinion, the court of Grenoble decided the particular point in question, substantially upon these grounds: That in the consideration of contracts, the common intention of the parties must be sought for; that from the circumstances of the case, and the manner in which the parties had executed their contract, the conviction was irresistible that, although *Perrichon* acknowledged himself to be a debtor, purely and simply, to *Costaz & Co.*, in a sum of 40,000 francs, which he promised to pay at an early day, yet the parties really understood that the obligation was to serve as a mortgage security, not only for what was then due, but for what might eventually be due in account current; that the manner in which the account current was kept, was in accordance with this understanding; that such an agreement was not a just subject of complaint, in a legal aspect, because parties may adopt such forms as suit them to protect their agreements, even when such forms seem to conflict with them, provided their real intentions can be appreciated, and they do nothing that offends the laws, good morals and public order; and, that as regards third persons, they suffered no injury by such an agreement, because persons dealing with *Perrichon*, after the contract of 1839, having notice of the registry of the notarial act, were thus informed of all they had an interest to know, to wit, that the real estate of *Perrichon* was affected by an incumbrance for 40,000 francs. Mr. Troplong, as "*conseiller rapporteur*," thus practically treated the question: Quant aux reproches faits par le demandeur à l'inscription relativement à la date et à la nature de la dette, au montant du capital, à l'époque de l'exigibilité, il oublie que l'inscription contient toutes les mentions voulues par la loi, et que s'il y a quelque différence entre l'inscription et le titre, ce n'est pas une raison pour annuler l'inscription, surtout lorsqu'il n'en résulte aucun préjudice aux créanciers. Car, point de préjudice; ils n'ont pas été induits en erreur, ils n'ont pas été trompés. The views of Troplong and of the court of Grenoble were clearly adopted by the court of last resort. Considérant que la cour d'appel de Grenoble, en interprétant le contrat du 6 Mars, 1839, d'après la correspondance et l'exécution donnée à cet acte, y a vu, non pas un prêt pur et simple de 40,000 fr., mais une sûreté hypothécaire pour solde final d'un compte courant, jusqu'à concurrence de ladite somme; — qu'en cela, elle n'a fait qu'user d'un droit souverain et consacrer des conventions parfaitement légitimes; — que cette interpétation, bien que donnant à l'acte un sens

<div style="float:right">PICKERSGILL<br>*v.*<br>BROWN.</div>

réel, différent du sens apparent, n'enlève à la convention d'hypothèque aucune de ses conditions essentielles ; — que cette hypothèque s'est manifestée par une inscription revêtue de toutes les formalités légales, et qui a suffisamment éclairé les tiers sur les ressources du débiteur, et prévenu toute surprise possible ; — que vainement on insiste pour soutenir que, dans le flux et le reflux du compte courant, il a pu arriver un moment où les sommes prêtées ont été compensées par des sommes rendues, et que, dans cette hypothèse, l'hypothèque manquerait de cause ; — qu'en matière de compte courant, il n'est pas permis, tant que ce compte n'est pas clos définitivement, de compenser tel article du crédit par tel article du débit; — qu'en effet, ce serait l'arrêter pendant qu'il court encore ; — qu'il faut faire une masse de toutes les opérations successives jusqu'à conclusion, et que c'est seulement à cette époque qu'on peut décider s'il y a un créancier ou s'il n'y en a pas ; — qu'en procédant d'après ces règles, la Cour d'appel, loin de violer aucune loi, a fait, au contraire, la plus juste application des principes de la matière ; — rejette.

At this stage of our inquiries, it is proper to notice an objection raised on the score of usury, to a very important item of the advances.

The account rendered 30th November, 1843, exhibits, as we have stated, a cash balance on that day of $453,072 91. A portion of the advances of which it was composed, consists of $107,428 32 for Planters' Bank bonds, charged to *Lapice* at ten per cent below the par amount of their face and interest; instead of which amount, the plaintiffs say he could only have been lawfully charged $61,394, that being, say they, the value of the bonds at that time, at fifty cents on the dollar, which rate a witness, *Barker*, says was the market rate of those obligations.

The transaction, as explained by the witness, was this: *Lapice* was indebted to the Merchants' Bank of New Orleans in a sum exceeding, with interest, $100,000. He made an agreement with the bank to receive from him, in payment of this debt, bonds of the Planters' Bank of Mississippi at par. The bank then transferred *Lapice's* notes to *H. Bean & Co.*, (of which firm the witness, *Barker*, was a member) with the agreement, that they should comply with the stipulations made with *Lapice*. The bonds were then furnished by *Brown's* agent to *Lapice*, and the debt was thus paid (with subrogation) to *Bean & Co.* Thus *Lapice* got the bonds at 90 cents on the dollar, and used them in payment of his own debt at par. It is not proved that the Planters' Bank was insolvent, and ultimately failed to meet its obligations, nor that the bonds in question were not worth as much to *Brown* as *Lapice* promised to pay for them. It is clear, that *Lapice* has long since lost the rights, as between himself and *Brown*, of opening this transaction on the score of usury.

Upon this branch of the cause the defendant's counsel have argued, that his mortgage rights cannot be questioned by the plaintiffs.

1st. Because, under the decision of this court, in the *Bank of Louisiana v. Briscoe*, 3 Ann. 157, which, it is said covers the present case, the transaction could not be pronounced usurious.

2d. That the question of usury has been long since put at rest between the original parties, by the settlements of account from year to year, and the prescription established by the Act of 1844.

3d. Because, the revocatory action which the law accords to creditors, is limited to the evidence of contracts made in fraud of creditors, and resulting in injury to them, and that the acceptance of a usurious loan is not such a contract

as can be reached or interfered with by third persons; that the revocatory action requires proof of a fraudulent concert between the debtor and the person with whom he has contracted; and that the law never contemplated the placing of the debtor in a state of pupilage, so that his contracts might be supervised by his creditors, and he thus protected from his own imprudence.

4th. That the revocatory action is prescribed by one year, dating, in cases of mere preference, from the act complained of, and in cases of fraud to the injury of a creditor from the date of his judgment against the debtor.

Without deciding upon all these points, it is sufficient to say, that the fourth point is well taken. The defendant, if otherwise assailable, is protected by prescription. The first judgment, recited in the petition of the plaintiffs, was obtained in 1844, the two others in 1846. The citation in this cause was served in April, 1850. See Civil Code, arts. 1982, 1989.

The same remarks apply to other items of inferior magnitude referred to by counsel.

We come now to the consideration of the antichresis, and of the account since its creation. And, with regard to these accounts, we have first to remark, that the defendant was called upon to produce them, under oath; that he has so produced them; and, therefore, as the district judge did, we are to take them as true, in the absence of any evidence impeaching their veracity.

This act of antichresis was executed on the 13th May, 1843. It refers to the obligations and acts of mortgage of April and May, 1842; declares, that such payments as *Lapice* had made, on account of them, were not more than equal to the interest due thereon, and that his indebtedness still amounts to the sum of $400,000, which he acknowledges to be the amount due at the date of the act of antichresis. He declares, that it his desire to secure payment of the interest that may hereafter accrue on the obligations, covered by the mortgages, and also to give additional security for the payment of the obligations themselves; and that, therefore, without in any manner impairing the full force and effect of the two mortgages he transfers, pledges, &c., to *Brown*, by way of antichresis, the crops, revenues, &c., of the plantations, slaves, mills, &c., being the same described in the mortgages. *Brown*, by his agent, *Nicholson*, acknowledges possession of the property. It was agreed, that it was to remain pledged in antichresis, until the said debt of $400,000, with interest from the date of the antichresis, should be wholly paid by *Lapice*, or until it should be paid out of the crops and revenues of the property so pledged. It was also agreed, that *Brown* was to be allowed, out of the crops, for all taxes and annual charges, and for the keeping, and useful and necessary repairs and improvements of the estates, the maintenance of the slaves, horses, cattle, &c., and for all other necessary and unavoidable expenses for the raising of crops and working the mills.

It was said, that the astounding fact meets us at the threshold of this investigation, that a claim of $400,000, for which the antichresis was granted on the 13th May, 1843, instead of being diminished by the crops yielded by the estates during about seven years, and amounting to a sum of $531,884 32, has swelled, on the 1st November, 1849, to a cash balance of $744,445 91.

Although on the face of the antichresis it appears, that $400,000 was then the amount of the debt, (the effect of which recital we shall hereafter have occasion to consider,) yet in point of fact, the cash balance of the account, if it had been struck on that day, would have presented an amount larger by about $50,000. It must also be observed that, after the date of the antichresis, a sum,

which the plaintiffs state at upwards of $120,000, was expended in establishing on one of the sugar estates machinery for refining sugar. ' Another new item, which figures in the account in principal and interest, as stated by the plaintiffs, at $168,795 18, arose from the settlement, by *Brown*, of large prior incumbrances held by the Union Bank and other creditors. When to these, and other large new advances, we add the cost of plantation supplies, salaries, factor's commissions, &c., and take into view the accruing interest, which was also compounded by striking annual balances, and renditions of account annually, approved by *Lapice*, the augmentation of the debt, under the antichresis, is explained.

But the plaintiffs contend for a different imputation of payments, from that adopted by the parties, and also urge, that the large amounts expended for improvements, should be stricken from the accounts. "All the extravagant expenditures incurred by *Brown*," we. quote the language of counsel in their printed argument, "or rather by *Lapice*, since the date of the antichresis, must be disallowed, so far as the rights of third parties are concerned; a man who is so utterly ruined, according to his own representations, as to be obliged to pledge all his property, in order to diminish his debt by means of the revenues of his estates, cannot be permitted to run into wild speculations, in the establishment of sugar refineries, &c., amounting to hundreds of thousands of dollars; much less can the favorite creditor, to whom an act of antichresis has been granted, squander the revenues of the property, from year to year, in making costly experiments, under the pretext of increasing the productiveness, with a view, the sooner to extinguish the debt for which the antichresis was granted. If no other parties than *Lapice* and *Brown* were interested in the matter, they might do what they thought proper; but a court of justice will not sanction such scandalous proceedings, when they are carried on at the expense and to the detriment of honest creditors, who have been so unfortunate as to have placed confidence in a man who has so shamefully abused that confidence."

The motive of *Brown* in making these disbursements, is stated in his answers to interrogatories; and his statement is not contradicted by other evidence. His opinion, as to their expediency, is also there given; and it appears from other testimony in the cause, that this opinion was an honest one, and was adopted, after sending an agent to Cuba to see the working of similar apparatus there, and judge of the expediency of adopting it; by which agent, a favorable report was made. Whether these so called improvements in the manufacture of sugar exhibit, in general, results commensurate to the expensive outlay which they involve, is a question upon which, as the testimony shows, planters differ; but that this money was disbursed by the defendant, is very cogent evidence of his conviction, that it would be of advantage to the property, in the productiveness of which he had an enormous interest. An intention to injure creditors, cannot be reasonably inferred from his course in this matter.

While the creditor, who holds property on antichresis, is bound to make useful and necessary repairs of the pledged estate, (Civil Code, 3144) it seems, on the other hand, to be well settled doctrine, that he is not permitted, as such creditor, to effect improvements of a new, expensive and unusual character, or which materially change the mode of cultivating or using the estate granted in antichresis. If he do so, he is considered as doing an injustice to the proprietor, in making his withdrawal of the property more onerous. He would not be allowed the absolute reimbursement of his outlay, but could; it seems, at most, recover only the increased value actually given by such improvements or change,

PICKERSGILL
*v.*
BROWN.

See Troplong Nantissement, No. 543. But when the debtor consents, there is, as between him and the grantee, no reason for complaint.

*Lapice's* consent to this use of the proceeds of the crops, having been conclusively shown, year after year, by his written approval of the annual accounts rendered, is it competent for the plaintiffs, at this late day, to dispute that application? That they cannot do so, results from a proper appreciation of the different nature of the contracts of mortgage and antichresis.

A mortgage in favor of one creditor, not put into action by *fieri facias* or writ of seizure, may coëxist with an antichresis in favor of another creditor. The antichresis operates upon the fruits, which the creditor, holding it, is thereby authorized, by his debtor, to gather. A mortgage affects the land. If the holder of the antichresis gathers the fruits before the mortgage creditor seizes, he can apply them to his debt. Just as the owner himself would have held the gathered fruits free from the mortgage, had he granted no antichresis. The creditor in antichresis, when he has gathered the fruits, owes his account to the owner, and not to the inactive mortgagee. But having agreed with the owner, to whom alone he is bound to account, to apply the proceeds of the gathered crops to his debt, he and the owner are obviously free to waive that application and use them in some other way. The owner might have spent them as he pleased, if he had not granted the antichresis; and the creditor in antichresis may, at his request, do the same. To illustrate the case in a simple form, suppose A gives to B in antichresis a slave, which he afterwards mortgaged to C. It is agreed that B shall hire out the slave, collect his wages, apply ten per cent of them to clothing the slave, and the residue to the payment of A's debt to him. B extravagantly spends twenty per cent of the wages received, in clothing the slave, credits the balance upon the debt, and renders to A an account showing such application, which A approves. Can C, who has not made a seizure, afterwards complain, and open this account? Clearly not.

It is charged, in the petition, that the antichresis was intended to obstruct and frustrate the plaintiffs in the collection of their debts. We do not find this charge sustained by the evidence; and, we may add, if such had been the desire of *Lapice*, and the defendant had been willing to lend himself to such a purpose, they chose, in this form of contract, a very inefficient means to such an end. For creditors are free to cut it off by levying a *fieri facias*. Civil Code 3148. Troplong Nantissement, No. 573, 585. By this simple remedy, the plaintiffs could have annihilated the antichresis years ago. Our remarks on the subject of prescription, also apply to this branch of the case.

The district judge adopted the accounts rendered to *Lapice*, and which have been filed, in this cause, as correct in point of verity; but he reformed them on various grounds.

One was, that compound interest was not to be allowed. The accounts were annually stated, and the balance of interest, was carried into the account as a part of the principal bearing interest for the next year. This mode of establishing a compounding of interest, was considered and approved in *Thompson v. Mylne*, 4 Ann. 210.

He also opened and separated portions of the account, in consequence of a view he took of the mortgage securities and judgment, in which we are unable to concur. He considered the mortgage of 28th April, 1842, as only securing debts of *Lapice* to *Brown*, existing anterior to 3d May, 1842, when judgment was confessed upon the obligations of $250,000, recited in that mortgage. He also

considered the mortgage of 12th May, 1842, as covering, only to the amount of <span style="float:right">PICKERSGILL</span> $150,000, payments for and advances made to *Lapice* by *Brown*, between 3d <span style="float:right">*v.*</span> May, 1842, and 13th May, 1843, date of the antichresis, deducting from their <span style="float:right">BROWN.</span> amount the intermediate credits.

We have already stated, that these mortgages and mortgage obligations were really taken as security for advances made, and to be made, in account current; and the confession of judgment was nothing more than a cumulative security, adding a judgment to the mortgage which already protected the obligation of $250,000. We see no reason why a confession of judgment may not be taken as security. In *Toledano* v. *Relf*, we recently had an example of that mode of taking security, in which we saw nothing illegal. We must not confound the debt in account current, with the obligations taken as security for that debt. They are as distinct as they would have been if, instead of giving these mortgage obligations as security, *Lapice* had pledged to *Brown* the mortgage obligations of third persons. Viewed in this light, the embarrassment disappears. That this was the light in which the parties considered the matter, is plain. And hence it was that, in the entire account current, from beginning to end, these two obligations, for $250,000 and $150,000, are never charged, but are wholly left out of the account, precisely as was done by the parties in *Perrichon* v. *Costaz & Co.*

What, then, is the effect of these securities? Clearly, to protect the defendant by mortgage to an amount of $400,000, and interest at eight per cent thereon.

We do not consider that the antichresis, which was taken as additional security, impairs the mortgage securities, except in this respect, that it declared the interest on these obligations, up to the date of the antichresis, had been paid. As to third persons disputing his mortgage rights, *Brown* is estopped by that acknowledgment, improvidently made and recorded in the mortgage offices; although between himself and *Lapice*, as debtor and creditor, the mistake is rectified by the account current.

We are of opinion, therefore, that the mortgages stand as securities for *Lapice's* debt to *Brown*, in account current, to an amount of $400,000, and interest thereon at eight per cent per annum, from the 13th of May, 1843, such being the amount inscribed in the mortgage offices.

The claim and mortgages of the defendant carry eight per cent interest; and, under the statutes, the imposition of damages is not imperative. We do not think this a case, all the circumstances considered, in which damages should be imposed.

It is therefore decreed, that the judgment of the district court be reversed, and that the plaintiff pay the costs of this appeal. It is further decreed, that the said *James Brown* was, on the 1st day of November, 1850, a creditor of *Peter Michel Lapice*, for the sum of $742,626 01, with interest thereon at the rate of eight per centum per annum, from the 30th day of November, 1850, until paid, subject to any credits in favor of said debtor realized since said 1st of November, 1850, and costs of suit No. ——, of the docket of the Fifth District Court of New Orleans, entitled *James Brown* v. *P. M. Lapice*. It is further decreed, that, for the security of the payment of the indebtedness aforesaid, the said *James Brown* has a conventional mortgage upon the lands, slaves and other property, described in the act of mortgage, executed, by the said *Peter M. Lapice*, to the said *James Brown*, on the 28th of April, 1842, and on the 12th

<div style="margin-left:margin">PICKERSGILL
*v.*
BROWN.</div>

of May, 1842, whereof copies are on file in this cause, up to an amount of $400,000, with interest thereon at the rate of eight per centum per annum from the 13th day of May, 1843, until said mortgage be enforced by sale, or said indebtedness of *P. M. Lapice* be otherwise discharged; and that said conventional mortgage, so held by the said *James Brown*, is superior in rank to the judicial mortgages in favor of the plaintiffs, in their petition set forth; and must be satisfied by preference over said plaintiffs, out of said mortgaged property. It is further decreed, that the injunction issued in this cause, be dissolved, and that the said *Brown* have leave to proceed in the execution of the writ of *fieri facias* so enjoined; but that upon the claim of the said *Brown* for damages, there be judgment against him. It is further decreed, that the costs of this suit in the court below, be paid equally by said plaintiffs and said defendant, excepting those arising from the injunction, which are to be paid exclusively by said plaintiffs.

Appellee's counsel applied for a re-hearing.

We have quoted the whole argument on which the decision of this important question rests, for the purpose of beseeching the court to reëxamine it once more, before the doctrine here enunciated, is finally incorporated into the jurisprudence of the State. There are certain general principles of law so obvious and plain, that it is inconceivable that any difference of opinion can possibly exist in their application. One of these principles is, that there can be no accessary obligation, without a subsisting principal obligation to which it is attached. Indeed, it is a contradiction in terms, to contend for the contrary. There is, surely, no refinement or subtlety in the position, that there can be no mortgage unless there be a legal obligation, a *vinculum juris*, whose performance is to be secured. This is not the theory of the Civil Code of Louisiana, or of any other code, either ancient or modern; but it necessarily results from the nature of things; for the existence of a mortgage, independent of a principal obligation, is a legal impossibility; and if the Legislature had said, in the broadest terms imaginable, that a mortgage may exist as an independent contract, would that have removed the legal impossibility? Certainly not. Our code does inform us, in three or four different articles, that a contract and an obligation are synonymous terms; but will any one, therefore, pretend that these legislative declarations have destroyed the distinction between the cause and the effect? So, if the framers of the code had undertaken to establish the rule, that a mortgage might be granted to secure an obligation which has not yet risen into existence, they would have said an idle thing, if a literal interpretation was to be given to their language. But it is perfectly evident that they have not been guilty of any such absurdity. The art. 3259 contains no new doctrine, nor any exception to that general principle, that a mortgage cannot exist as an independent contract. That article merely develops the rule laid down in the article immediately preceding it, which declares, " that a mortgage may be stipulated for the fulfilment of any obligation whatever, even for the completion of a deed." After having stated the rule in these general terms, the code proceeds:

" A mortgage may be given for an obligation, which has not yet risen into existence; as when a man grants a mortgage, by way of security, for endorsements which another promises to make for him.

" But the right of mortgage, in this case, shall only be realized in so far as the promise shall be carried into effect by the person making it. The fulfilment of the promise, however, shall impart to the mortgage a retrospective effect, to the time of the contract."

Now, with all due respect, we would ask, what is the meaning of the provisions of these two articles of the code? Do they introduce any innovation in jurisprudence, or do they widen the range of conventional mortgages, for the purpose of meeting the exigencies of practical business and of commerce? We humbly contend, that the framers of the code had no such object in view. On the contrary, the intention of the lawgiver is evident, and entirely consistent with the all pervading and unbending general principle on the subject; for he says, in terms not to be misunderstood, that there must be two distinct contracts, one of which gives rise to the principal obligation, the other, to the secondary;

the first is called the principal contract, by which one of the parties promises, i. e. obligates himself, to do some act for the other, whence a conditional obligation arises; but as long as the condition has not happened, on which the obligation depends, it (the obligation) has not yet risen into existence; the second is the accessary contract, i. e. the mortgage, to indemnify the party against the consequences of the obligation which may or may not arise from the principal contract. But if the principal contract produces no obligation, of course the accessary is likewise inoperative. We repeat, that these articles afford the strongest illustration of the general rule, instead of containing an exception to it.

The doctrine of potestative conditions, in relation to which so much has been written, and which has given rise to so much controversy, it is humbly submitted, has not the remotest application to the question involved in this suit.

We insist that *Brown* was under no legal obligation to make advances to *Lapice*, after the 12th May, 1842; and that nothing but a legal obligation can be the basis of a valid mortgage. And we most respectfully ask, where is the evidence of any such legal obligation on the part of *Brown?* It is said that the acts of the parties (*Brown* and *Lapice*) create a reasonable presumption that their understanding was, that *Brown* should advance, and *Lapice* borrow, to an amount of $400,000, to be thrown into account current to be kept by *Brown*, who, through his agent in New Orleans, was to have the consignment of *Lapice's* crops, and act as his factor. At first the parties seem to have supposed $250,000 would be a sufficient margin, but they subsequently enlarged it to $400,000, as shown by the second mortgage of May 12, 1842, some time previous to which they had begun arrangements with regard to a settlement of *Lapice's* debts to the Merchants' Bank, which alone amounted to more than $100,000; and although *Lapice* had not received an actual advance to the whole amount of $400,000 on that day, there is no reasonable doubt on our mind, that it was well understood he should have it, and that *Brown* could not, without a breach of good faith, have refused it. This reasonable inference, from the acts of the parties, down to the 12th May, is fully supported by the events which followed within a reasonable time, and before the mortgage held by the plaintiffs came into being."

But it is clear that the question is not met by this view of the subject. With great deference to the opinion of the court, the question is not whether *Brown* could or could not, without a breach of good faith, have refused to make advances, but whether *Lapice* could have compelled him, by an action, to do so. On what ground would such an action have been sustained? How could *Lapice* have made out his case against *Brown?* Are there any facts disclosed in this record which would have enabled *Lapice* to bring such a suit? It is said that the whole aspect of the case leads to the conclusion, that *Brown* was under a moral, if not a legal, obligation to make the advances to *Lapice*. In our humble opinion, it is immaterial whether there was such a moral or equitable obligation or not, for an imperfect obligation cannot be the foundation of a mortgage.

Will the court permit us most respectfully to ask the question, from what acts of the parties, or from what other facts in the record, the reasonable inference of the existence of even an equitable obligation, on the part of *Brown*, to make further advances, can be drawn? Is it from the fact, that on the 28th April, 1842, *Lapice* and *Brown* both stated, in the act of mortgage, that the latter had lent to the former, on that day, two hundred and fifty thousand dollars? Or is it from the fact, that on the 12th of May, 1842, the parties again stated, in an authentic act, that *Brown* had made a further loan to *Lapice* of one hundred and fifty thousand dollars, being the amount of sundry promissory notes drawn by him, the said *Lapice*, and paid by the said *Brown*, and other advances made by him, the said *Brown*, for the accommodation of the said *Lapice?* Or is it from the fact, that on the 3d of May, 1842, *Lapice* confessed a judgment in favor of *Brown*, for two hundred and fifty thousand dollars, with interest at eight per cent per annum? Or is it from the fact, that on the 13th May, 1843, the statements contained in the two acts of mortgage and in the judgment confessed, are solemnly reiterated and re-asseverated in the act of antichresis? If the reasonable presumption spoken of can be drawn from these facts, either singly or collectively, then we must confess that we are utterly ignorant of the laws of ratiocination, and never have had the remotest conception of the power of logic. And what are the other facts to be found in the case, from which the reasonable inference can be drawn? The fact that *Brown*, through his agent, *Samuel*

PICKERSGILL
v.
BROWN.

*Nicholson*, acted as the factor of *Lapice*, is certainly not of sufficient potency to gainsay the positive and unequivocal declarations of both *Brown* and *Lapice*, in the numerous acts referred to ; besides, how can it be said that any reasonable inference can be drawn from this fact, that *Brown* obligated himself to make further advances, even if it was not flatly contradicted by the declarations of the parties themselves ? What then remains ? The solitary fact, that *Brown* did buy up *Lapice's* paper, at enormous discount, fifty cents in the dollar, after the 12th May, 1842 ! Now, if this fact alone leads to the reasonable inference, that this piece of unconscionable usury was the result of a legal obligation on the part of *Brown* to make future advances to *Lapice*, to which the mortgages can attach, then, we admit that our views in relation to this case have been erroneous from beginning to end.

With all the deference and respect which we unaffectedly entertain for the opinions pronounced by this honorable court, we cannot but believe that the legal doctrine, on which the judgment in the present case is founded, is not sound.

Let us now examine whether this doctrine receives any countenance from authority. The case of *Brander* v. *Bowman and Abercrombie*, 10 L. R. 371, is certainly not in point. That case merely applies the familiar principle, that although there can be no valid obligation without a legal cause or consideration, yet it is not necessary that the cause or consideration should be stated in the written act or instrument, by which the contract giving rise to the obligation is evinced ; and that even when the cause stated is false, still, if the existence of a true cause can be proved, the obligation must be maintained. In that case, the court say, "From the answers of both defendants, it results that the act of mortgage attached was executed for a valuable consideration, in this, that a part of the amount was really due at the time, and the balance was to secure certain endorsement or security debts which *Abercrombie* had contracted for *Bowman*, and which he was bound to pay, one and two years afterwards. Under this state of facts, no possible objection could be made to the mortgage.

Nor does the view of the law adopted by the court, receive the slightest support from the case of *Perrichon* v. *Costaz et al.*, reported by Dalloz ; for the leading feature in that case, as in *Brander* v. *Bowman and Abercrombie*, was, that though the cause stated in the act of mortgage was false, nevertheless the contract, and the obligation produced by it, were valid, because a true and sufficient cause was established by the evidence. The existence of the principal obligation, to which the mortgage attached, was found, as a matter of fact, by the Royal Court. Over that question the Court of Cassation, under the organization of the Judiciary Department in France, had no jurisdiction ; hence, there could be no doubt of the validity of the mortgage.

The French tribunals never have, and, we are sure, never will decide, that a mortgage can have a legal existence, when there is no principal contract or obligation on which it leans for its support. And we are equally certain, that such an idea has never been advanced by any writer of authority, either ancient or modern.

Re-hearing refused.